**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY W. TINDLE,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 2:05cv0047** |
| **MICHAEL J. ASTRUE,[1] COMMISSIONER OF SOCIAL SECURITY** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Timothy W. Tindle's Motion for Judgment on the Administrative Record and supporting Brief (Doc. Nos. 13 & 14), seeking judicial review of the Commissioner's denial of his claim for Supplemental Security Income ("SSI") payments based on disability. The Commissioner of Social Security ("Commissioner" or "Defendant") has filed a response opposing Plaintiff's motion (Doc. No. 15).

Upon review of the Administrative Record as a whole (hereafter, "AR") (Doc. No. 11)**,** the Court finds that the ALJ's decision denying benefits is **NOT** supported by substantial evidence. The Plaintiff's motion for judgment will therefore be GRANTED and this matter remanded for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

Timothy Tindle ("Plaintiff") has applied for Social Security benefits twice. He first applied for benefits on August 31, 1999, alleging disability due to low intellectual functioning and anxiety attacks (AR 38). This application was denied initially and upon reconsideration. Plaintiff then requested and received a hearing in front of an Administrative Law Judge (ALJ), who found, in a decision dated October 25, 2001, that Plaintiff was not disabled.

Plaintiff did not appeal the ALJ's decision on his first application, but he filed a second application for benefits on October 31, 2001, less than a week after receiving notice that his first application had been

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of the Social Security Administration on February 12, 2007. Pursuant to the Federal Rules of Civil Procedure, Commissioner Astrue automatically replaces Ms. Barnhart as the defendant in this case. Fed. R. Civ. P. 25(d)(1).

denied. This time he alleged several impairments including, again, low intellectual functioning and anxiety attacks (AR 87; Doc. No. 14, at 2). This application was also denied initially and on reconsideration. Plaintiff again received a hearing in front of an ALJ. In addition to requesting that the ALJ grant his second application, Plaintiff requested that the ALJ reopen his first application. The ALJ denied Plaintiff's second application, but he did not address Plaintiff's request to reopen the first application, presumably because he believed that his denial of Plaintiff's second application mooted Plaintiff's request to reopen the first application (Doc. No. 15, at 2). Plaintiff requested that the Appeals Council review the ALJ's decision, but it declined to do so. Thus, the ALJ's decision became the agency's final decision on his second application. Plaintiff seeks judicial review of (1) the ALJ's denial of his second application, and (2) the ALJ's refusal to reopen his first application.

## II. STATEMENT OF FACTS

Plaintiff was born in 1964 (AR 44). He attended school through the seventh grade and was in special education classes (AR 460). He failed the first and seventh grades (AR 153). He worked several unskilled jobs prior to 1999, but he has not worked since then (AR 479). At the time of the hearing he was living with his mother (AR 473), who is very sick (*see, e.g.*, AR 449).

Plaintiff alleges that he is disabled because he has several mental and physical impairments including mild mental retardation as well as anxiety, depression, chronic obstructive pulmonary disease, and migraine headaches (AR 87; Doc. No. 14, at 2).

### A. Plaintiff's Intellectual Impairment

The Administrative Record contains some of Plaintiff's school records, which indicate that learning was always difficult for him and he struggled throughout his relatively brief academic career.[2] He

[2]The record includes a copy of a letter addressed to the Division of Special Education of the San Diego, California Public Schools, from clinical psychologist Jerry N. Boone, PhD, dated August 13, 1968 concerning a Tim Tindle. (AR 150–51.) The parties, the ALJ, and even the White County Board of Education have evidently all assumed this letter refers to Plaintiff despite the fact that the letter is dated 1968 and refers to an eight-year-old child, while Plaintiff would only have been four in 1968. The letter could conceivably be misdated, but it refers to a child whose family was planning to move to California because the child's father was in the Navy and expected to be transferred to a naval base there. It also indicates the child's father's name is Clifford Tindle. Plaintiff's father's name is Robert Tindle, and Plaintiff attended White County, Tennessee schools from the first through the eighth grades. In any event, the letter refers to a child who, at the age of 8 years and 8 months, was in the second grade and doing poorly in every area except reading. According to Dr. Boone, this child had already repeated the first grade and was likely to fail second grade as well. He had been slow in most developmental areas and "was just learning, at age 8 – 8, to tie his shoes." (AR 150.) On the Wechsler Intelligence Scale for Children he

apparently completed the eighth grade, after repeating both the first and seventh grades. He consistently achieved grades primarily in the C and D range and was in special classes for most of the time he was in school. In April 1977 when he would have been nearing the end of his sixth-grade year, Plaintiff took the Stanford Achievement Test, administered by the State of Tennessee. He scored in the lowest 1% in the "Total Reading" category, 6% in "Total Auditory," 2% in "Total Math," and 1% in the "Total Battery" category.

As an adult, during the course of applying for Social Security benefits the second time around, Plaintiff was administered an IQ test by Dr. William O'Brien, to whom he was referred by the Commissioner, on February 19, 2002. According to the results of that test, Plaintiff had a Verbal IQ score of 61 and a Performance IQ score of 64 on the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"). (AR 346.)[3] Based on these test results, Dr. O'Brien assessed Plaintiff as mildly mentally retarded. (AR 346.) Dr. O'Brien recommended review of Plaintiff's academic records to confirm his own clinical impressions, but there is no indication in the record that he believed the intelligence test results to be invalid. In fact, Dr. O'Brien noted initially that Plaintiff was a poor historian and that the results of his overall examination "should be reviewed with caution due to he may be underestimating and under-reporting the nature of his complaints." (AR 343.)

Plaintiff underwent a second intelligence test, this time administered by Mary Kay Matthews, L.P.E., again at the Commissioner's request, on April 19, 2004. Plaintiff's results on the WAIS-III this time showed a verbal IQ of 66, a performance IQ of 64, and a full scale IQ of 63, which again placed him squarely in the mild mental retardation range of intellectual functioning. (AR 170.) Ms. Matthews did not indicate that Plaintiff appeared to be exaggerating his symptoms or putting forth less than a valid effort on

---

had earned a Verbal IQ of 75, Performance IQ of 75, and full scale IQ of 72. On the basis of his IQ level as well as his performance on other tests, Dr. Boone felt that Plaintiff needed to be in special classes "designed for higher-level educable mentally retarded children." (AR 150.) Despite the letter's reference to a child named Tim Tindle of low intellectual functioning, the Court concludes that it is highly unlikely that this letter concerns the Tim Tindle who is the Plaintiff in this case and will therefore disregard the letter altogether.

[3]Although the numbers in Dr. O'Brien's report and the AR are numbered sequentially, a page seems to be missing from Dr. O'Brien's report. At the bottom of page 345 (page 3 of Dr. O'Brien's report) is the subheading "Psychological Testing:" but the text at the top of 346 (page 4 of Dr. O'Brien's report) begins in the middle of a sentence: "his functioning within the Extremely Low range, ranking him at the 0.3 percentile when compared to individuals his own age." The results included in the record do not include a full-scale IQ score, though Plaintiff's counsel reported it to be 59. (Doc. No. 14 at 4.)

the IQ test. To the contrary, Ms. Matthews noted that Plaintiff cooperated throughout the assessment (AR 167), and she believed Plaintiff to be a reliable source of information (AR 166). She also noted that the WAIS-III scores were considered to be valid (AR 170). On the Wide Range Achievement Test, Third Edition, Plaintiff demonstrated reading, spelling, and arithmetic ability at the first grade level. (AR 171.) Despite the presumed validity of the test results, however, Ms. Matthews stated that she believed Plaintiff was functioning in the borderline range of intelligence, "by history" (AR 171), "because of his ability to care for his ailing mother and his past ability to work for extended periods of time." (AR 170, 171–72.)

**B. Plaintiff's Psychiatric Impairments**

Plaintiff has seen several health professionals who have opined on his mental health. These professionals can be placed into three categories: those who did not assign Plaintiff any work-related restrictions based on his mental health, those who assigned Plaintiff mild or moderate work-related restrictions based on his mental health, and those who assigned Plaintiff significant work-related restrictions based on his mental health.

The first group includes Dr. Amad Altabba and Dr. Abhay Kemkar, both of whom have treated Plaintiff. Dr. Altabba diagnosed Plaintiff with chronic anxiety and panic attacks (AR 178). Dr. Kemkar diagnosed Plaintiff with anxiety, migraine headaches, and panic attacks (AR 412, 420). Neither doctor stated whether Plaintiff's mental disabilities restrict his ability to work.

The second group includes three agency consultants (Mary Kay Matthews, L.P.E., Dr. Victor Pestrak, and Dr. Reeta Misra), and two treating doctors (Dr. Jan Mayer and Dr. Rosalia Dominguez) who both work for the Cheer Mental Health Clinic. Ms. Matthews found that Plaintiff had depressive disorder, anxiety disorder and, as indicated above, borderline intellectual functioning (AR 171). She also stated that he was "moderately limited in his ability to understand, remember, or carry out more detailed instructions; and mildly limited in his ability to maintain concentration, persistence, or pace, handle changes in work setting, or handle everyday stressors of the workplace" (AR 171). Dr. Pestrak diagnosed Plaintiff with depressive disorder, anxiety, and borderline intellectual functioning (based solely on his review of the record) (AR 362–63). He also assigned him as having mild to moderate limitations in his mental and social abilities (AR 373–75). Dr. Misra stated that Plaintiff is "not significantly limited in his ability to remember work procedures, to understand and remember simple or detailed instructions, to

carry out simple instructions, to perform within a schedule, maintain regular attendance, and be punctual, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to get along with coworkers, or to maintain socially appropriate behavior" (AR 351–53). Dr. Mayer diagnosed Plaintiff with anxiety disorder (AR 300). Dr. Dominguez diagnosed him with generalized anxiety disorder and depressive disorder (AR 261). A Clinically Related Group ("CRG") form completed by one of the physicians at the Cheer Mental Health Clinic, Dr. Mayer's and Dr. Dominguez's employer, at the Social Security Administration's request, indicates that Plaintiff has moderate limitations with regard to interpersonal functioning, concentration/task performance/pace, and adaptation to change (AR 389–90).

The last group includes only Dr. William O'Brien, an agency consultant, and Abby Eibel, M.Ed., to whom Plaintiff was referred by his lawyer (AR 23). Dr. O'Brien diagnosed Plaintiff with major depressive disorder and anxiety disorder, in addition to mild mental retardation (AR 346). He also stated that Plaintiff was "significantly limited in his ability to sustain concentration and persistence, adapt to changes in a moderate to complex work environment, tolerate moderate to high levels of stress, and process information in an effective and efficient manner" (AR 346). Ms. Eibel diagnosed Plaintiff with recurrent major depressive disorder, panic disorder, and mild mental retardation, and indicated that he functioned at extremely low levels (AR 406).

**C. Plaintiff's Physical Impairments**

Plaintiff has also seen several professionals who have opined on his physical health. None of them have assigned Plaintiff any significant work-related restrictions due to his physical impairments. Dr. Kemkar, a treating physician, diagnosed Plaintiff with chest pains, migraines, asthma, ataxia, dypnea, palpitations, insomnia, and back pain (AR 411–45), but he indicated that Plaintiff's impairments did not limit his ability to do physical work (AR 408–10). Dr. Timothy Fisher, an agency consultant, diagnosed Plaintiff with mild obstructive lung disease (AR 335). He also stated that Plaintiff could frequently lift or carry 15 to 30 pounds, 10 to 20 pounds repetitively, and stand or walk six to eight hours in a workday (AR 334). Dr. Misra, another treating physician, indicated that Plaintiff could stand or walk about 6 hours in an 8-hour workday, could sit for 6 hours, and could lift or carry up to 20 pounds occasionally and 10 pounds frequently (AR 350). She also said that Plaintiff could climb, balance, stoop, kneel, crouch, or crawl occasionally, and had no manipulative, visual, communicative, or environmental limitations (AR 351–53).

Ms. Matthews diagnosed Plaintiff with migraine headaches and back pain, but she indicated no work-related restrictions (AR 171).

## III. THE ALJ'S FINDINGS

The ALJ found that Plaintiff's combination of impairments are severe and include borderline intellectual functioning, a major depressive disorder, generalized anxiety disorder, chronic obstructive pulmonary disease/asthma, gastrointestinal reflux disease and substance dependence (AR 32). However, he found that this combination of impairments does not meet or medically equal one of the listed impairments in 404 CFR Subpart P, Appendix 1 (AR 32), largely because he found that Plaintiff was in the borderline range of intellectual functioning rather than in the mild mental retardation range. Specifically, he found Plaintiff to be not entirely credible and believed Plaintiff's scores on his recent IQ tests suggested a "conscious attempt to put forth less than full effort." (AR 25.) On the basis of the Plaintiff's combination of physical impairments, the ALJ found that he had the residual functional capacity to perform light work activity, with some minor restrictions. He further found that Plaintiff's residual functional capacity (RFC) also included "marginal literacy and moderate mental limitations in the ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting." (AR 32.) The ALJ further found that, given these limitations, Plaintiff could no longer perform his past relevant work, but that there is a significant number of jobs in the national economy that Plaintiff could perform and, therefore, that Plaintiff is not disabled (AR 32–33).

The ALJ's finding that there was work Plaintiff could perform that accommodated his impairments was based on the testimony of Rebecca Williams, a vocational expert ("VE"). At the hearing, the ALJ asked the VE to assume that a hypothetical claimant could perform work at the light level of exertion but with the limitations indicated above. The VE testified that a substantial number of jobs existed in the national economy that a person with all these limitations could perform, including approximately 900,000

light jobs as a machine operator (18,000 in the Tennessee regional economy), 500,000 assembler jobs (10,000 in the regional economy), 67,000 parts inspector (1,000 in the regional economy), 150,000 unskilled sedentary jobs as an assembler (3,000 regionally), 67,000 jobs as inspector (900 regionally), and 69,000 general laborer jobs (1,3000 regionally) (AR 481–82). The ALJ adopted and accepted her testimony as supporting his determination that Plaintiff is not disabled for SSI purposes.

## IV. DISCUSSION

### A. Standard Of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantiality is based upon the record taken as a whole. *See Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

### B. Evaluation Of Entitlement To Social Security Benefits

Under the Social Security Act (the "Act"), Plaintiff is entitled to receive benefits only if he is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. *See id.* The Sixth Circuit has summarized the steps as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**C. Claimant's Statement of Errors**

In this case Plaintiff claims that the ALJ erred in failing to find Plaintiff disabled at Step Three on the basis that he meets Listing 12.05C and in failing to address Plaintiff's request to reopen his prior claim for benefits. As discussed above, the Court agrees that the ALJ's determination that Plaintiff has borderline intelligence rather than mild mental retardation is not supported by substantial evidence in the record and that the ALJ therefore erred in finding that Plaintiff did not meet the impairment listed in Section 12.05C of Appendix 1.[4] Further, remand is required for the ALJ to consider Plaintiff's request to reopen his prior application for benefits.

***1. The ALJ's Determination Regarding Plaintiff's Level of Intellectual Functioning***

Listing 12.05 states in pertinent part:

Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the

[4]Plaintiff also argues in the alternative that the ALJ erred in failing to find that he "equaled" a listed impairment and that the ALJ mischaracterized the evidence concerning the severity of Plaintiff's anxiety and depression. The Court has no need to reach these arguments, having concluded that Plaintiff meets a listed impairment.

> impairment before age 22.
>
> The required level of impairment is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 (hereafter, "App. 1") § 12.05C. The ALJ found that Plaintiff did not have a valid IQ score of 60 through 70, and that he therefore did not meet the mental retardation impairment listed in 12.05C.

Generally speaking, while "[s]tandardized intelligence tests are essential to the adjudication of all cases of mental retardation that are not covered under the provisions of 12.05A," the regulations nonetheless recognize that "the results of intelligence tests are only part of the overall assessment, [so] the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." App. 1 § 12.00D(6)(a) &(b); *cf. Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 69 (6th Cir. 1991) ("The regulations do not limit the question of validity to test results alone in isolation from other factors."). Thus, the ALJ may discount an IQ score as invalid for a variety of reasons, so long as there is substantial evidence in the record to support his conclusion. *See, e.g.*, *Muse v. Sullivan*, 925 F.2d 785, 788–90 (5th Cir. 1991); *Hutsell v. Sullivan*, 892 F.2d 747, 750–51 & n.4 (8th Cir. 1989); *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986).

As the Sixth Circuit has noted:

> Mild mental retardation is roughly equivalent to what used to be referred to as the educational category of "educable" . . . . People with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens *they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support*, but may need guidance and assistance when under unusual social or economic stress. At the present time, *virtually all people with Mild Mental Retardation can live successfully in the community, independently* or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) (quoting DSM-III-R § 317.00, adding emphasis).

Plaintiff scored between 60 and 70 in all areas in his two recent IQ tests,[5] which would indicate mild mental retardation. Neither Dr. O'Brien nor Ms. Matthews questioned the validity of the test results nor questioned Plaintiff's effort on the tests. Ms. Matthews, while specifically stating that the results of the WAIS-III are considered valid, nonetheless believed that Plaintiff was actually "functioning" at the borderline intellectual level, rather than the mild mental retardation level, based on his work history and the fact that he was assisting his sick mother.

The ALJ rejected Dr. O'Brien's assessment and accorded great weight to Ms. Matthews' based in substantial part on the ALJ's assumption that Dr. Boone's 1968 letter referencing IQ scores actually pertained to Plaintiff and on his finding that Plaintiff was not fully credible. (See AR 29 ("[The academic records reveal I.Q. scores of 75, 75, and 72 (full scale), which are considered to be valid indicators of his current level of functioning.").) In addition, the ALJ believed Plaintiff's school records constituted evidence that Plaintiff's IQ scores did not reflect his true intellectual abilities. In particular, the ALJ found it particularly "noteworthy that the claimant has a good cursive signature. In elementary school, everyone learns to print first and cursive writing comes much later. His ability to cursive write tends to suggest a level of literacy more consistent with when it is taught in school, i.e., about the third grade (which is consistent with what he scored on tests in school)." On that basis, the ALJ found that Plaintiff's recent test scores on the Wide Range Achievement Test, placing him at the first grade level for reading and math skills, did not accurately reflect his abilities, but that his school records from thirty years ago "reflect his true reading and writing abilities and his lower scores on recent psychological testing suggests a conscious attempt to put forth less than full effort." (AR 25.)

The Court finds that the ALJ's determination in that regard is not supported by substantial evidence in the record. First, for reasons previously noted (note 2, *supra*), the Court finds that the ALJ's reliance on the letter by Dr. Boone is misplaced, as the only suggestion in that letter that it has any relevance to Plaintiff is that it references a Tim Tindle of limited intellectual ability. There are no other reliable indicia in the letter that it could possibly pertain to Plaintiff. Likewise, the ALJ's belief that Plaintiff's school records supported a finding of borderline intelligence and his reliance on the difference

[5]The regulations provide that, "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided . . . , we use the lowest of these in conjunction with 12.05." Id. § 12.00D(6)(c).

between Plaintiff's current abilities as reflected in the Wide Range Achieivement Test (1st Grade level) and his reading ability thirty years ago as reflected in his elementary school records (3rd Grade level at age 11, in addition to the fact that he obtained an occasional C in English and Reading), are simply not reasonable. The ALJ's speculation that Plaintiff must be malingering now because his reading skills have regressed in the intervening years is nothing but that – speculation. Moreover, the fact that Plaintiff once reached the ability to read at the third-grade level is not contra-indicative of mild mental retardation. *Cf. Brown*, 948 F.2d at 270. The ALJ also relied on an assessment in elementary school that Plaintiff was "not retarded." (*See* AR 24.) The ALJ is referencing an assessment performed by a Dr. William R. Center performed on January 4, 1974, when Plaintiff was nine years old and having significant performance problems at school. Dr. Center indicated he did not believe Plaintiff was retarded but could catch up with some individual attention. The opinion at that point that Plaintiff was not retarded was apparently not based on any kind of IQ test. (AR 149.) Three years later at a re-assessment, Plaintiff was still performing well below his grade level and had made "very little improvement." (AR 157.) These results are clearly not inconsistent with mild mental retardation and do not support the ALJ's finding of borderline intelligence.

Second, Ms. Matthews' determination that Plaintiff was functioning at the borderline intellectual level rather than at the level indicated by his test scores (which she considered to be valid) is not substantiated. The Sixth Circuit has found that a full-scale I.Q. score of 68 is not necessarily inconsistent with a plaintiff's ability to use public transit, obtain a driver's license and drive, visit friends, make change at a grocery store, do his own laundry, clean his room, complete the sixth grade, and achieve a limited level of reading comprehension (including the ability to follow a road atlas and read a newspaper), and work as a truck driver (which required recording mileage, driving destinations, and hours worked). *Brown*, 948 F.2d 268. *See also Mowery v. Heckler*, 771 F.2d 966, 971 (6th Cir. 1985) (noting that a claimant's past ability to work and to function despite his intellectual impairment does not mean his intellectual impairment is not severe). In *Brown*, the ALJ rather than the test administrator made the assumption that these activities were not consistent with an IQ in the mild mental retardation range. Here, although the opinion is expressed by Ms. Matthews, L.P.E. (who, it should be observed, is neither a medical doctor, a

psychiatrist nor a psychologist[6]), the Court finds that her opinion is not empirically substantiated either, particularly given that Ms. Matthews herself stated that the IQ test results were considered valid. The activities in which Plaintiff is able to engage, including assisting his mother, taking care of his own personal needs, doing some rudimentary housework and meal preparation, in conjunction with his past work history—all at the unskilled level—cannot be deemed inconsistent with mild mental retardation, particularly in light of the Sixth Circuit's definition thereof as set forth in *Brown*. *Cf. Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) (finding the ALJ's rejection of plaintiff's full-scale IQ score was not supported by substantial evidence in the record where the licensed psychologist who administered the IQ test did not question the validity of the results, and the activities to which the ALJ (and district court) pointed in support of their decision were not inconsistent with mild mental retardation, including plaintiff's ability to pay his own bills, add and subtract, use an ATM machine, take care of all his own personal needs; identify and administer his medication; obtain a GED, and previous work painting, wallpapering, and cutting grass). In fact, generally speaking, cases in which a finding of borderline intelligence has been considered supported by the record despite an IQ test result indicating mild mental retardation usually involve test scores ranging in the 60s and 70s and evidence of adaptive abilities much more advanced than Plaintiff's here. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007) (where the plaintiff had IQ scores of 77 verbal, 70 performance, and 72 full scale on the WAIS-III, the clinical psychologist's assessment of him as being within the borderline level of intelligence, rather than mildly mentally retarded, was supported by the plaintiff's activities including doing semi-skilled work for a number of years, riding a motorcycle and playing guitar); *Elam v. Comm'r or Soc. Sec.*, 348 F.3d 124 (6th Cir. 2003) (substantial evidence supported the finding that the plaintiff was in the borderline range of intelligence although her test scores indicated mild mental retardation; on one test, the plaintiff obtained a verbal IQ score of 57 and a full-scale score of 64, but a performance score of 77, in addition to scores on the Wide Range Achievement Test that indicated functioning at a much higher level than the IQ scores indicated, and an educational psychologist testified at the hearing that that the plaintiff's communication skills were inconsistent with those of a person with intelligence test scores in the low- to mid-sixties);

[6]By regulation, an acceptable source of medical evidence is considered to be either a licensed physician, a licensed osteopath or a licensed or certified psychologist. *See* 20 C.F.R. §§ 404.1513(a)(1)-(3); 416.913(a)(1)-(3); *Elam v. Comm'r of Soc. Security*, 348 F.3d 124, 126 (6th Cir. 2003).

*Clark v. Apfel*, 141 F.3d 1253 (8th Cir. 1998) (holding the ALJ properly rejected the validity of the claimant's performance IQ of 66 and full scale IQ of 67 where the Plaintiff had worked in the private sector, had a driver's license, could read and write and had completed ninth grade without special education services, was the primary caretaker of her young daughter, and exhibited no deficit in social functioning or restriction in her daily activities, and no significant deficiency in concentration, persistence or pace); *Popp v. Heckler*, 779 F.2d 1497 (11th Cir. 1986) (holding the ALJ did not have to accept scores in the listing range for a claimant who had a two-year college degree, was enrolled in a third year of college, and had a history of several skilled jobs including teaching algebra at a private school).

In addition, the ALJ's determination that Plaintiff must have put forth less than a full effort on either of the tests was not substantiated either by Dr. O'Brien or by Ms. Matthews, who actually administered the tests. Further, the consistency between the results of the two tests, taken two years apart, further supports the reliability of the results and minimizes the possibility that Plaintiff was intentionally underperforming. The Court also notes that Plaintiff, in his dealings with Ms. Matthews and Dr. O'Brien, apparently did not ever attribute his inability to work to his low level of intellectual functioning – rather, he attributed it to his physical problems. (*See* AR 166 (noting Plaintiff filed for disability benefits based on "Depression, nerves and anxiety") and 167 (indicating he told Ms. Matthews he was unable to work because "My health is bad and I have panic attacks."); AR 343 (indicating he reported to Dr. O'Brien that unspecified heart and respiratory problems interfered with his ability to work), The fact that Plaintiff apparently did not attribute his inability to work to his low level of intellectual functioning tends to indicate he had no reason intentionally to underperform on the tests.

Finally, the other "inconsistencies" in the record on which the ALJ relies to find Plaintiff less than fully credible are all either meaningless or else have nothing to do with Plaintiff's intellectual abilities. For instance, the ALJ emphasized that Plaintiff reported to Abby Eibel, MA.Ed., that he was "homeless" when he was actually staying with various family members and friends, moving around so as not to bother anyone. (AR 23, 31.) He did not hide his living arrangements from Ms. Eibel and the question of whether he was actually homeless was obviously one of semantics. Similarly, he initially told Dr. O'Brien, when questioned about his daily activities, that he did "nothing" but, on further questioning, revealed a range of daily activities including light housework and occasionally heating a can of soup. Again, he did not

conceal the scope of his activities from Dr. O'Brien, and the Court strongly suspects that most people who had done nothing all day except vacuum, watch a little television, and heat a can of soup would likewise answer "Nothing" to the question of what they had done that day, unless pressed more closely.

In sum, Plaintiff's credibility or lack thereof does not undermine the validity of the test results found by both Dr. O'Brien and Ms. Matthews, and there is not substantial evidence in the record to support the ALJ's (or Ms. Matthews') rejection of Plaintiff's IQ scores. Moreover, the record is clear that Plaintiff's intellectually impairment initially manifested during the developmental period (before age 22).

Once mild mental retardation is demonstrated, the additional impairment required to meet the 12.05C listing must be "more than slight or minimal," but need not be "severe" in step two terms, much less "disabling" under step five standards. *McKown v. Shalala*, 5 F.3d 546, 1993 WL 335788 (10th Cir. Aug. 26, 1993). Here, the ALJ found Plaintiff suffered from a combination of impairments, in addition to his intellectual impairment, considered "severe," including chronic obstructive pulmonary disease/asthma, gastrointestinal reflux disease, a major depressive disorder, generalized anxiety disorder and substance dependence. As a result of his physical impairments alone, the ALJ found the Plaintiff was limited to performing work at the light level of exertion, with some additional restrictions. In other words, the ALJ's findings clearly indicate the presence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function," App. 1, § 12.05C, which, in conjunction with his mild mental retardation, is sufficient to meet the Listing at § 12.05C. *Cf. Markle*, 324 F.3d at 187–88 (holding that where the "[t]he medical evidence establishes that the claimant has severe chronic obstructive pulmonary disease, hypertension, obesity, gout, and diminished intelligence," and that these severe impairments restrict the claimant to a limited range of light work, the second criterion for entitlement under § 12.05C is met).

The ALJ erred in finding that Plaintiff did not have a valid IQ score between 60 and 70. That error, in conjunction with the ALJ's other findings regarding the Plaintiff's psychological and physical impairments, leads the Court to determine that the ALJ erred in holding that Plaintiff did not meet Listing 12.05C.

### ***2. The ALJ's Refusal to Reopen Plaintiff's Prior Application***

The ALJ did not address Plaintiff's request to reopen his first application, presumably because the denial of Plaintiff's second application, based on essentially the same claims as his first, mooted Plaintiff's request to reopen his first application. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

Ordinarily federal courts do not have jurisdiction to review an ALJ's decision not to reopen a prior application. *Anderson v. Comm'r or Soc. Sec.*, 195 Fed. Appx. 366, 369 (6th Cir. 2006). Where, however, the claimant's mental capacity may have prevented him from pursuing his administrative remedies, a colorable constitutional claim, couched in a denial of due process, is established, thereby conferring judicial review pursuant to 42 U.S.C. § 405(g). *Wills v. Sec'y Health & Human Servs.*, 802 F.2d 870, 873 (6th Cir. 1986). Moreover, under Social Security Ruling ("SSR") 91-5p, a colorable mental-incapacity claim is established when the fact of mental incapacity is coupled with a showing of lack of anyone legally responsible for prosecuting the claim – *i.e.*, an attorney. *Id.*

In this case, according to the ALJ's written opinion denying Plaintiff's first application, the ALJ noted that Plaintiff was represented at the first hearing by Pat Hyder, a *non-attorney* representative. (AR 37.) Plaintiff also testified in his second hearing that after his first hearing, Mr. Hyder told him he had won his case and got him 14 months of back pay. (AR 459.) He was therefore confused when he received the notice from the Social Security office telling him he had not won, but when he called the Social Security office to find out what he was supposed to do, he was told he should "just let everything go and start all over." (*Id.*) As a result, Plaintiff filed a new application for social security benefits within one week after receiving notice that his first application had been denied.

Under the circumstances, the Court finds that the ALJ erred in failing to address whether Plaintiff's initial application should have been re-opened. On remand, the ALJ should consider this issue.

**V. CONCLUSION**

For the reasons set forth above, Plaintiff's motion for judgment on the administrative record will be granted and judgment entered in favor of the Plaintiff, on the basis that the ALJ's decision that Plaintiff did not meet Listing 12.05C is not supported by substantial evidence in the record and the ALJ further erred in failing to consider whether Plaintiff's initial application should be re-opened. The matter will

therefore be remanded for further proceedings consistent with this opinion.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge